IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**AFFORDIFY, INC.,**

Plaintiff,

v.

**MEDAC, INC.,**

Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Affordify, Inc. ("Affordify") for its Complaint against Defendant Medac, Inc. ("Medac"), hereby states as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff Affordify is a corporation organized under the laws of the state of Delaware, with a principal place of business located at 3513 Brighton Boulevard, Denver, Colorado 80216.[1]

2. Defendant Medac holds itself out as a corporation organized under the laws of the state of Georgia, with a principal place of business located at 150 Bluff Avenue, North Augusta, South Carolina 29841.

3. This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. § 1332 (diversity of citizenship), because (a) the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and (b) Affordify is a corporate citizen

---

[1] Affordify is in the process of relocating its operations to the Houston, Texas area. Until that relocation process is completed, however, Affordify's principal place of business remains to be located in Denver, Colorado. Further, regardless of whether Affordify's principal place of business is located in Texas or Colorado, complete diversity of citizenship exists between Affordify and Medac.

of Delaware and Colorado and Medac is a corporate citizen of Georgia and South Carolina.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). A substantial part of the events and omissions giving rise to Affordify's claims against Medac occurred in this judicial district, and it is where a substantial amount of the work associated with the parties' contractual relationship took place.

5. Further, both Medac and Affordify have contractually agreed that the federal and state courts in Denver, Colorado "shall have exclusive personal jurisdiction and venue with respect to such Party, and each Party hereby submits to the exclusive personal jurisdiction and venue of such courts." *See* Ex. A, Strategic Services Agreement, dated April 19, 2018.

## STATEMENT OF FACTS

6. This Complaint arises out certain contracts and business dealings between Affordify and Medac, beginning in 2018 and continuing to the present day.

### Affordify's Automated Payment Processing System

7. Affordify is a healthcare-focused financial technology company and an industry leader in anesthesia medical payment processing. Affordify's automated patient payment process: (1) securely collects patient financial and insurance information; (2) confirms a patient's preauthorization; (3) deposits any upfront payments prior to the medical procedure; (4) automates electronic processes for notification and communication for all parties involved; and (5) analyzes and automates final payments.

8. Affordify's suite of innovative solutions have changed the way the healthcare industry handles patient payments by improving patient payment rates and alleviating patient stress points. Under Affordify's system, patients receive advance understanding of the anticipated costs of anesthesia prior to their medical procedure; as a result, patients are better

- 2 -

108725425.1

able to manage their medical costs. As an added benefit, anesthesia groups working with Affordify are able to realize and collect upon a higher percentage of patient payments due for their services, and also receive those payments more quickly. Health provider systems are offered continued improvement by Affordify through data analytics, hands-on training, and rapid adjustment to security and compliance advancements.

9. Affordify expended substantial time, money, and other resources developing its technology and services. Affordify invested approximately $2 million in developing Affordify's automated payment processing technology. Key components of that technology include: software development, cloud computing services, automated compliance, security, and beta and regression testing. From conception, Affordify's development process took more than two years to complete. Affordify also engaged teams of product managers, engineers, and project managers to bring its primary solution to the anesthesia medical payment processing market.

10. Medical groups across the country have rapidly adopted the Affordify solution. Affordify's approach to automation, security, and compliance have successfully answered long felt needs in the medical industry, previously unresolved for over twenty-five years. As a result, Affordify has received and continues to receive overwhelming praise from both patients and anesthesia groups.

11. Affordify's automated medical payment platform includes many trade secrets that are not apparent from merely using Affordify's products, as they are provided to anesthesia or other medical groups. Nor can Affordify's trade secrets be readily determined by a process of reverse engineering.

12. Affordify's confidential and proprietary trade secrets include, without limitation: overall software architecture for an integrated automated medical payment service;

implementation of automated compliance and security measures; automation of financial transactions; and automated access, storage, and dissemination of necessary communications.

13. More specifically, Affordify's trade secrets consist of: (1) software architecture and code; (2) selection of cybersecurity solutions; (3) optimized integration; (4) selection of compliance solutions; (5) data analysis methods; (6) pricing, marketing, and customer information; and (7) selection of automated user interface methods.

14. These trade secrets address essential components of Affordify's technology and services, including the unique layout, data flow, security parameters, assessment points, controls, workflow, compliance considerations, and other criteria required to provide an integrated automated medical payment processing product.

15. Affordify has also taken reasonable and appropriate steps to protect the secrecy of its trade secrets. These measures included:

    a. Negotiating agreements with terms and provisions forbidding the misuse or disclosure of Affordify's trade secrets;

    b. Marking or otherwise identifying drawings, codes, summaries, or written presentations containing Affordify's trade secrets as being confidential and/or proprietary information of Affordify;

    c. Implementing internal procedures to safeguard its trade secrets, such as (i) restricting the access of Affordify personnel to its trade secrets; (ii) reporting requests for confidential information to management within Affordify; (iii) requiring approval to disclose confidential information containing Affordify's trade secrets; (iv) providing only the specifically-requested portions of confidential data; and (v) requiring employees to sign

      non-disclosure agreements; and

    d. Implementing safeguards for any external disclosure of Affordify's trade secrets, including, but not limited to: (i) modification of certain confidential data, such that if it was disclosed, it would be of limited use in copying Affordify's automated medical payment processing products; (ii) refusing to provide certain Affordify trade secrets outside of Affordify; (iii) securely storing code and other proprietary information kept on computer servers; (iv) monitoring requests for and access to Affordify's trade secrets; and (v) requiring the comprehensive use of non-disclosure agreements.

### The Strategic Services Agreement

16. In 2018, Affordify and Medac began exploring a potential business partnership. Medac is one of the nation's largest, independently owned, anesthesia revenue cycle management companies. Medac's revenue cycle management services were designed to assist clients with the business management functions associated with the delivery of anesthesia services —— including billing and collection functions. Medac was acquired by MiraMed, Inc. on May 1, 2019.

17. Through the business relationship contemplated by the parties, Medac would refer healthcare merchants and/or providers to Affordify. Affordify could then evaluate the referred merchant or provider to determine if they were a good candidate for Affordify's payment processing services, and if appropriate, enter into an agreement with the merchant or provider for the provision of such services by Affordify.

18. Affordify and Medac eventually entered into a Strategic Service Agreement ("SSA") with an effective date of April 19, 2018. A copy of the SSA is attached hereto as

Exhibit A. The SSA was executed by Affordify on April 19, 2018 and by Medac on January 9, 2019.

19. Pursuant to the SSA, Medac was supposed to introduce healthcare merchants and providers to Affordify, so that Affordify could potentially enter into Merchant or Collection Agreements with the referred providers or merchants. *See* Ex. A, § 5. Affordify would have sole and exclusive authority to review the referred providers and merchants to determine whether they met Affordify's underwriting requirements and other applicable criteria, and negotiate the establishment, modification, termination, and/or extension of any Merchant Agreements. *Id.* §§ 4, 6.

20. In exchange for the referral of providers and merchants to Affordify, Medac would receive fees composed of certain monthly residual payments as set forth in the SSA. *Id.* § 7.

21. Under the SSA, Medac was also obligated to cooperate with Affordify and supply necessary information to Affordify with respect to the referred merchants and/or providers. Section 5 of the SSA stated that Medac shall (i) "submit to Affordify such information as is necessary or appropriate for Affordify to contact and solicit such Referred Merchant for Payment Processing Services;" (ii) "share the data that is reasonably necessary for Affordify to complete analysis, service, bill, etc. for shared healthcare providers;" and (iii) "collaborate with Affordify to streamline processes and technology to best serve healthcare providers." *Id*.

22. The SSA further contained robust non-competition, non-solicitation, and non-disparagement provisions. *Id.* §§ 8, 10-11.

23. Section 8 provided for a "Non-Solicitation Period" spanning from the effective date of the SSA (April 19, 2018) until two years after the termination date of the SSA. During

the Non-Solicitation Period, Medac and its Affiliates were prohibited from soliciting any of the referred merchants or providers in connection with Payment Processing Services to be performed by any party other than Affordify, "or in any manner persuad[ing] or influenc[ing] such Referred Merchant to cease any business relationship with Affordify or any of its Affiliates." *Id*.

24. In § 10, Medac covenanted and agreed that during the term of the SSA, and for a twelve-month period thereafter, Medac and its Affiliates would not "on behalf of any Competitive Business perform or create the same or substantially the same services, sales techniques, technologies, merchant service operations, etc." *Id*.

25. And in § 11, Medac and Affordify "agree[d] that during the term of the Agreement, both Parties will not negatively influence any of the other Party's clients from purchasing the other Party's products or services or solicit or influence or attempt to influence any client, customer or other person, either directly or indirectly, to direct any purchase of products or services to any person, firm, corporation, institution or other entity in competition with the business of the other Party." *Id*.

26. Following the execution of the SSA, Medac referred certain providers and/or merchants to Affordify per the terms of the agreement. Affordify thereafter expended significant time and resources evaluating the referred providers and merchants and, with respect to a number of them, pursuing business relationships, including executing Merchant Agreements pursuant to the terms of the SSA.

**The Master Services Agreement**

27. In 2019, Medac and Affordify entered into an additional agreement, a Master Services Agreement ("MSA") effective as of April 1, 2019. *See* Ex. B hereto.

28. Under the MSA, Affordify was to provide services to Medac pursuant to

Statement of Work No. 1 (the "SOW"). *See* Ex. C hereto. Under the SOW, Medac agreed to pay Affordify $27,000 a month for a minimum of six months, in exchange for Affordify providing four to five technology resources to help Medac update their technology platform, move to cloud computing, and become PCI compliant. *Id*.

29. On May 1, 2019, Medac was acquired by MiraMed. Shortly thereafter, Medac terminated the MSA by letter dated May 15, 2019 and the SOW was terminated by letter dated May 10, 2019.

**Medac Breaches the SSA and Interferes With Affordify's Business Relationships**

30. At or around the same time as the MiraMed acquisition, Medac engaged in a course of conduct that not only breached the terms of the SSA, but actively interfered with Affordify's existing and prospective clients and falsely and unfairly defamed Affordify.

31. Affordify has received communications, both orally and via email, indicating that Medac has been falsely representing to Affordify's current and potential clients that Affordify (i) was not in compliance with the requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and/or the Health Information Technology for Economic and Clinical Health (HITECH) Act, and (ii) lacked required or adequate insurance.

32. For example, as evidenced by the June 2019 email chain attached hereto as Exhibit D, Medac falsely informed a prospective client of Affordify, Ohio Anesthesia Group, that it had encountered "issues…from an Affordify HIPAA/HITECH diligence perspective as well as an E&O insurance perspective." *Id*. Medac represented that these alleged issues were the reason behind its decision not to continue its business relationship with Affordify. *Id*.

33. Affordify has also been informed that Bijon Memar, the CEO of Medac; Tony Mira, the CEO of MiraMed and Anesthesia Business Consultants, LLC ("ABC"), a subsidiary of

MiraMed; and Fred Fazio, the CFO of Miramed, participated in a July 8, 2019 meeting with an existing client of Affordify, Anesthesia Consultants of Augusta. Upon information and belief, during that conversation, representatives from Anesthesia Consultants of Augusta were told that Affordify was not HIPAA/HITECH compliant and lacked proper insurance.

34. Affordify has received other reports from trustworthy sources that certain parties associated with Medac — including Bijon Memar, Fred Fazio, and Bellinger Moody, the President of Medac — have been conveying the same detrimental and false information regarding Affordify to other existing or prospective clients of Affordify.

35. These clients include, but are not limited to: NorthStar Anesthesia; Jefferson Memorial; Virginia Anesthesia Group; Oregon Anesthesia Group; Allegheny Health System; Tampa Anesthesia Consultants; and others. These groups were ready to do business with Affordify, or have done business with Affordify, and all but Anesthesia Consultants of Augusta have now ceased communications with Affordify. In particular, Affordify's contract with NorthStar Anesthesia was within days of moving forward at the time of Medac's interference, and alone was worth approximately $24 million in revenue over a three-year period.

36. Affordify has good cause to believe that Medac intentionally spread false information regarding Affordify so that Medac could build its own version of Affordify's technology and services, in order to compete with and undercut Affordify, all in direct breach of the SSA.

37. Medac's conduct has cost Affordify countless business relationships and associated revenue, and has more generally caused damage to the Affordify's name and reputation in the healthcare marketplace.

38. Medac has further breached the SSA, and damaged Affordify's relationships with

existing clients, by failing or refusing the provide "data that is reasonably necessary for Affordify to complete analysis, service, bill, etc. for shared healthcare providers," as required by § 5 of the SSA. Medac's withholding of this information has materially impeded Affordify's ability to perform the Payment Processing Services contemplated by the SSA.

### Medac Seeks to Misappropriate Affordify's Trade Secrets

39. In addition to the injuries suffered by Affordify as a result of the above misconduct, Medac has further harmed Affordify by misappropriating or attempting to misappropriate Affordify's trade secrets.

40. MiraMed's CFO, Fred Fazio, told Ryan Kraynick, Co-Founder and CEO of Affordify, that ABC would attempt to replicate Affordify's trade secrets. Mr. Fazio told Mr. Kraynick that "we're not going to give you 90% of the revenue on our clients if we can do it ourselves" because "that would be stupid."

41. Mr. Kraynick was also recently informed by a representative of Ohio Anesthesia Group that Bijon Memar and Fred Fazio claimed to be creating their own patient payment platform to replicate Affordify's technology and services. Furthermore, Affordify has been told that, during a June 2019 sales presentation with the Virginia Anesthesia Group, Mr. Memar represented that ABC and Medac were creating a patient payment platform in order to address their purported concerns regarding Affordify's legal compliance and insurance. Affordify has received reports that similar statements were made to other prospective clients of Affordify.

42. Since the acquisition of Medac by MiraMed, Medac has repeatedly demanded that Affordify provide it with confidential trade secret information regarding its finances, operational processes, technology processes, contracts, pricing, and customer lists. Affordify has good cause to believe that Medac is requesting this information so that it can copy Affordify's technology,

business relationships, operations, and other trade secrets, both for its own use and in order to compete with Affordify.

43. On June 4, 2019, Fred Fazio sent an email to Ryan Kraynick, requesting a substantial amount of information regarding Affordify's contracts, financial statements, insurance coverage, pricing, IT capabilities, and operational workflow. *See* Ex. E.

44. On June 14, 2019, Fred Fazio sent another email to Ryan Kraynick, demanding that an even more onerous set of confidential information be provided by Affordify. *Id*.

45. Although Medac conducted a substantial due diligence process prior to entering into the SSA with Affordify, Mr. Fazio now claimed that additional information had to be provided because Medac "ha[d] no objective basis to conclude that a Medac/Affordify business relationship is financially viable or whether Affordify is capable of performing." *Id*.[2] He alleged that without this information, Medac "cannot comfortably recommend Affordify to our customers." *Id*.

46. Finally, on June 27, 2019, counsel for Medac sent a "Notice of Termination of Strategic Service Agreement" to Affordify, stating that Medac would terminate the SSA pursuant to § 12 of the agreement if Affordify did not comply with Medac's highly burdensome and unjustified requests for information. *See* Ex. F.

47. Section 12 of the SSA deals with "Events of Default" and permits termination of the SSA upon thirty-days notice and opportunity to cure, in the event of a party's "refusal or failure to perform any material covenant or obligation of such Party under this Agreement." *See* Ex. A. No provision on the SSA obligated Affordify to provide the requested information,

---

[2] Affordify extensively trained Medac's employees regarding its automated patient payment process. In fact, Affordify's Co-Founder and Chief Technology Officer ("CTO"), Nancy E. Davis, contracted with Medac to act as its interim CTO for a several month period in early-2019. Under the circumstances, any suggestion by Medac that it did not understand Affordify's processes or capability to perform is highly pretextual and lacks any factual basis whatsoever.

however. *Id*.

48. Medac has no legitimate need for, or right to, the information that it is seeking from Affordify. Rather, it appears Medac is demanding this information now — over a year after the effective date of the SSA — so that it can misappropriate and leverage Affordify's trade secrets for its own advantage.

## COUNT I:
## BREACH OF CONTRACT

49. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

50. Affordify and Medac entered into a valid and enforceable agreement, namely the SSA, with an effective date of April 19, 2018.

51. Affordify fully performed all of its duties and obligations under the SSA; and to the extent Affordify has not performed any duty or obligation under the SSA, such nonperformance was justified by Medac's conduct which frustrated and prevented Affordify's performance.

52. Medac has failed to perform its duties and obligations under the SSA, and has breached numerous terms of the SSA, including, without limitation:

   a. Section 5 of the SSA, by refusing and/or failing to provide Affordify with the data reasonably necessary for Affordify to perform Payment Processing Services as contemplated by the SSA; and

   b. Sections 8, 10, and 11 of the SSA, by attempting to persuade merchants and/or providers to cease their business relationships with Affordify; attempting to copy Affordify's services, sales techniques, technologies, and/or merchant service operations; and negatively influencing clients from purchasing

Affordify's products or services.

53. Affordify has been damaged as a result of Medac's breaches of contract.

## COUNT II:
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

54. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

55. Affordify and Medac entered into a valid and enforceable agreement, namely the SSA, with an effective date of April 19, 2018.

56. Under the SSA, Medac had some discretionary authority to determine the manner or extent of its performance with respect to certain terms.

57. Medac failed to act in good faith when performing its duties and obligations under the SSA, as set forth in greater detail *supra*.

58. Affordify has been damaged as a result of Medac's breaches of the implied covenant of good faith and fair dealing.

## COUNT III:
## MISAPPROPRIATION OF TRADE SECRETS
## (Colorado Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 *et seq.*)

59. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

60. As discussed in Paragraphs ¶¶ 7-14, *supra*, Affordify has developed and possesses valuable trade secrets with respect to its automated medical payment platform, system, operational processes, and related technology. This information, along with Affordify's finances, contracts, pricing, and customer lists, constitutes confidential, competitively-sensitive, and proprietary information, the confidentiality of which is closely safeguarded by Affordify.

Paragraph 15, *supra*, sets forth the many steps taken by Affordify to prevent any unauthorized use or disclosure of its confidential trade secret information.

61. Through its confidential business relationship with Affordify, Medac obtained knowledge of certain of Affordify's trade secrets, and was prohibited under the SSA from improperly using such information to Medac's advantage or to disadvantage Affordify.

62. Based on Medac's conduct and the comments made by Fred Fazio and others, it appears that Medac is seeking to use Affordify's trade secrets without its consent to copy Affordify's automated medical payment platform, system, operational processes, and related technology, so that Medac can use those processes and technology to its own advantage and to gain a competitive advantage over Affordify.

63. Moreover, Medac has improperly attempted to leverage its SSA with Affordify to demand even greater knowledge of Affordify's trade secrets, so as to further its attempts to recreate Affordify's processes and technology.

64. Medac knew, or should have known, that it was not permitted to misuse the trade secret information obtained from Affordify pursuant to the SSA, as evidenced by the non-solicitation, non-compete, and non-disparagement provisions of that agreement.

65. Affordify has been damaged as a result of Medac's misuse and misappropriation of its trade secrets, including due to Medac's attempts to use such information to interfere with Affordify's relationships and business dealings with prospective and existing clients.

66. Affordify is likewise entitled to permanent injunctive relief under Colo. Rev. Stat. § 7-74-103 in the form of an order enjoining Medac and/or its affiliates from engaging in any activities involving the misuse, misappropriation, and/or unauthorized disclosure of Affordify's trade secrets.

## COUNT IV:
## DEFAMATION

67. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

68. Medac has made numerous statements to third parties, including prospective and existing clients of Affordify, falsely suggesting that Affordify is not compliant with HIPAA and the HITECH Act and lacks adequate insurance coverage.

69. Affordify has received at least one email reflecting the making of those statements to a potential customer of Affordify (*see* Ex. D), and has been informed by multiple third parties that Medac has made similar statements to other existing and prospective clients of Affordify.

70. Upon information and belief, Medac has also made false statements regarding Affordify's ability and resources to perform the services it offers to clients.

71. The statements made by Medac are false, and Medac knew that they were false at the time they were made, or at the very least, acted with reckless disregard as to the truth or falsity of its statements.

72. As a result of Medac's defamatory conduct, Affordify has been damaged.

## COUNT V:
## INTENTIONAL INTERFERENCE
## WITH EXISTING CONTRACTS

73. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

74. A valid and enforceable contract existed between Affordify and Anesthesia Consultants of Augusta.

75. Medac, through its involvement with the SSA and business dealings with Affordify, was aware of the contract between Affordify and Anesthesia Consultants of Augusta.

76. With the intent of inducing Anesthesia Consultants of Augusta to breach its agreement with Affordify and/or otherwise terminate its contract with Affordify, Medac took steps to defame Affordify, call into question Affordify's ability and resources to perform under the contract, and otherwise damage Affordify's reputation. Medac has also intentionally withheld information from Affordify that is necessary for Affordify to perform its obligations under its contract with Anesthesia Consultants of Augusta, and failed to provide records and data necessary for Anesthesia Consultants of Augusta to compensate Affordify for its services.

77. As a result of Medac's actions, Affordify has been damaged.

**COUNT VI:**
**TORTIOUS INTERFERENCE WITH**
**PROSPECTIVE CONTRACTUAL RELATIONSHIPS**

78. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

79. Over the last six to nine months, Affordify has expended significant resources exploring business relationships and engaging in contract negotiations with prospective clients referred by Medac pursuant to the SSA. These prospective clients include NorthStar Anesthesia; Ohio Anesthesia Group; Jefferson Memorial; Virginia Anesthesia Group; Oregon Anesthesia Group; Allegheny Health System; and Tampa Anesthesia Consultants.

80. Medac was aware of these efforts by Affordify, and knew there was a reasonable likelihood that contracts between Affordify and these clients would have resulted but for Medac's wrongful interference.

81. Medac acted improperly by inducing or otherwise causing these clients not to enter into or continue a prospective business relationship with Affordify, including by defaming Affordify, calling into question Affordify's ability and resources to perform under the contracts,

and otherwise damaging Affordify's reputation.

82. As a result of Medac's actions, Affordify has been damaged. Among other things, the aforementioned prospective clients have cut off communications and/or negotiations with Affordify.

### COUNT VI:
### DECLARATORY JUDGMENT
### (Colo. Rev. Stat. § 13-51-101 *et seq.*)

83. Affordify hereby incorporates and repeats the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

84. As set forth above, Medac breached the SSA (1) by refusing and/or failing to provide Affordify with data reasonably necessary for Affordify to perform Payment Processing Services, as contemplated by the SSA; and (2) by attempting to persuade merchants and/or providers to cease their business relationship with Affordify; attempting to copy Affordify's services, sales techniques, technologies, and/or merchant service operations without authorization; and negatively influencing clients from purchasing Affordify's products or services.

85. Medac actions were also tortious and in violation of Colorado's Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 *et seq.*

86. Pursuant to Colo. Rev. Stat. § 13-51-101 *et seq.*, a real and justiciable controversy exists between Affordify and Medac.

87. This Court should declare that Medac's actions as set forth herein (1) breached the terms of the SSA, and (2) violated Colorado's Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 *et seq.*

## DEMAND FOR RELIEF

Wherefore, Plaintiff Affordify, Inc. respectfully requests that the Court enter judgment in its favor as follows:

1. Awarding to Affordify its actual damages incurred in an amount to be proven at trial, plus interest, costs, and such other and further relief as the Court may deem just and proper;

2. Issuing a permanent injunction pursuant to Colo. Rev. Stat. § 7-74-103 enjoining Medac from engaging in any activities involving the misuse, misappropriation, and/or unauthorized disclosure of Affordify's trade secrets;

3. Issuing a declaration that Medac's actions as set forth herein (1) breached the terms of the SSA, and (2) violated Colorado's Trade Secrets Act, Colo. Rev. Stat. § 7-74-101 *et seq.*; and

4. Awarding such other relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

*/s/ Nicole K. Gorham*
Nicole K. Gorham, Esq., Atty No. 39186
LEWIS ROCA ROTHGERBER CHRISTIE LLP
1200 17th Street, Suite 3000
Denver, CO 80202
Email: ngorham@lrrc.com
Phone: (303) 623-9000
Fax:    (303) 623-9222

Royce R. Remington (Ohio #0040408)
(admission pending)
Email: rrremington@hahnlaw.com
Christina T. Hassel (Ohio #0088504)
(admission pending)
Email: chassel@hahnlaw.com
HAHN LOESER & PARKS LLP
200 Public Square, Suite 2800
Cleveland, Ohio 44114
Phone: (216) 621-0150
Fax:    (216) 274-2561

*Counsel for Plaintiff Affordify, Inc.*